IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MAURICE B. STEWART, JR.,          *

     Plaintiff,          *

v.          *          Civil Action No. GLR-19-679

CORIZON HEALTH COMPANY and          *
HOLLY PIERCE,
                      *

     Defendants.

                      ***

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant Corizon Health Company's ("Corizon") Motion to Dismiss or Alternatively for Summary Judgment (ECF No. 16).[1] The Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6. (D.Md. 2018). For the reasons outlined below, the Court will grant the Motion.

## I.     BACKGROUND

### A.    Stewart's Claims

Plaintiff Maurice B. Stewart, Jr. is a state prison inmate presently housed at North Branch Correctional Institution ("NBCI") in Cumberland, Maryland. (ECF No. 1).

---

[1] Also pending before the Court is Defendant Holly Pierce's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (ECF No. 37), which adopts and incorporates by reference Corizon's Motion and responsive filings. The Court will grant Pierce's Motion and treat Corizon's Motion as one filed jointly by Defendants.

Stewart suffers from an inflamed prostate and severe chronic pain in his groin and testicle area. (Compl. at 2, ECF No. 1; Supp. Compl. at 1, ECF No. 13).[2] According to Stewart, his prescription for Flomax—which was used to treat his inflamed prostate—expired in January 2018. (Supp. Compl. at 1–2). After submitting multiple sick call slips, Stewart was seen by Defendant Holly Pierce. (Id. at 2). Pierce advised Stewart that she would reorder Flomax; however, Pierce did not do so for eight months. (Id.). Stewart contends that Pierce deliberately refused to reorder Flomax despite knowing that Stewart suffered from an inflamed prostate and associated testicular pain and urinary issues. (Id. at 1–2). Stewart filed two administrative remedy procedure ("ARP") complaints regarding this issue, which were found meritorious. (Id. at 2). Stewart contends, however, that Pierce still failed to reorder the Flomax even after she spoke with ARP investigators. (Id.). As a result of the delay in receiving Flomax, Stewart suffered severe pain in the groin and stomach, swollen testicles, backed-up urine, and difficulty urinating. (Id.).

Stewart also suffers from severe headaches and pain in his left ear and the left side of his jaw due to dislocating his jaw in an old injury. (Compl. at 2). On November 8, 2018, Stewart was seen by an oral surgeon, who recommended Stewart undergo an MRI and CT scan. (Id. at 5). After he did not receive the recommended testing, Stewart filed an ARP. (Id. at 6). Because a consultation request for the testing had not been submitted as of January 7, 2019, Stewart's ARP was deemed meritorious. (Id.). The medical unit was then

---

[2] Unless otherwise noted, the Court takes the facts as outlined in Stewart's Complaint and Supplemental Complaint and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citations omitted).

directed to schedule Stewart an appointment to address the issue. (Id.). Stewart asserts, however, that Pierce failed to order a consultation for him to have a CT scan, MRI, and follow-up with the oral surgeon until three months after the oral surgeon recommended the diagnostic testing, despite knowing that Stewart was in pain on a regular basis. (Supp. Compl. at 2).

Finally, Stewart contends that two unidentified "schedulers" deliberately refused to schedule him for a visit in the chronic care clinic from August 20, 2018 until February 4, 2019, despite knowing about his repeated sick call slips and his ARP regarding the lack of testing for his jaw, ear, and head. (Id. at 2–3). Stewart filed a complaint regarding the delay in his chronic care visit, which was deemed meritorious. (Compl. at 7).

## B. **Medical Records**

A consultation request was submitted on October 7, 2014 for Stewart to be seen by an ENT specialist after he was assaulted with blunt trauma to his head and left jaw. (Defs.' Reply Pl.'s Resp. Mot. Dismiss Alt. Summ. J. ["Defs.' Reply"] Ex. C-1 ["Supp. Medical Records"] at 90, ECF No. 30-4). Stewart reported that he was unable to open his mouth without discomfort and complained of pain and tenderness to the temporomandibular joint ("TMJ").[3] (Id.). Stewart was sent to the emergency room for an evaluation after the assault.

---

[3] The TMJ connects the mandible (i.e., the lower jaw) to the temporal bone (i.e., the skull) in front of the ear. See https://www.emedicinehealth.com/temporomandibular_joint_tmj_syndrome/article_em.htm#what_is_temporomandibular_joint_tmj_syndrome (last visited Mar. 29, 2020). According to Pierce, the TMJ acts like a sliding hinge connecting the jawbone to the skull. (Aug. 15, 2019 Pierce Decl. ["2d Pierce Decl."] ¶ 7, ECF No. 30-3). TMJ disorders can cause pain in the jaw joint and in the muscle that controls the jaw. (Id.).

(Id.). An MRI of the left jaw revealed no fracture or dislocation, although there was an anterior displacement of the disc. (Id.). Stewart was seen on November 12, 2014 by Dr. Colin Ottey for follow-up regarding his jaw injury. (Id. at 92). Dr. Ottey noted that Stewart had no jaw fracture and no difficulty eating. (Id.). After discussion with dental staff, Dr. Ottey concluded that surgical intervention was not warranted at that time. (Id.).

As to Stewart's Flomax prescription, Dr. Mahboob Ashraf last prescribed Stewart Flomax on October 8, 2017; however, there was no clinical diagnosis associated with the prescription. (Aug. 15, 2019 Pierce Decl. ["2d Pierce Decl."] ¶ 9, ECF No. 30-3). On December 26, 2017, Stewart was seen by nurse practitioner Krista Self, who renewed some of Stewart's medications but did not renew the Flomax because there was no associated diagnosis and the prescription was set to expire in January 2018. (Id.).

Stewart filed a sick call slip on January 8, 2018, seeking to see a provider for a sore shoulder, sore throat, renewal of his chronic care medications, and to confirm that his CT scan had been scheduled. (Defs.' Mot. Dismiss Alt. Summ. J ["Defs.' Mot.] Ex. A1 ["Medical Records"] at 195, ECF No. 16-5). Stewart was seen by Dr. Ashraf on January 16, 2018, for a chronic care visit. (Id. at 5). At that time, Stewart had active prescriptions for Amitriptyline, Baclofen, and Gabapentin (Neurontin), which was prescribed for seizure control. (Id.). Stewart's reported medical problems were listed as glaucoma, malignant skin melanoma, epilepsy, asthma, backache, hypertension, chronic pain syndrome, and depression. (Id.). Dr. Ashraf directed Stewart to return to the chronic care clinic in three months. (Id. at 6). Stewart did not complain of jaw or testicular pain during this visit. (Id.).

Stewart filed a sick call slip on January 22, 2018, asking to see a provider for his sore shoulder and throat and to check on the result of the last x-ray of his shoulder. (Id. at 193). However, on January 25, 2018, Stewart refused to be seen. (Id. at 315).

In light of Stewart's history of malignant skin melanoma, on February 5, 2018, Pierce submitted a request for CT scan of Stewart's abdomen, pelvis, chest, and neck and noted that Stewart was to return to oncology after the diagnostic testing was completed. (Medical Records at 23). Stewart filed a sick call slip on February 8, 2018, complaining of a sore shoulder and throat and pain in his chest, stomach, and testicles, and reporting that his food was poisoned. (Id. at 190). He also asked that his Flomax and tar shampoo be refilled. (Id.). On February 10, 2018, Stewart was seen by nurse practitioner Krista Self, who noted that the results of Stewart's CT scan had been received and that Stewart was educated on the results. (Id.). Self also noted that Stewart's history of malignant skin melanoma was controlled. (Id. at 26). At the time, Stewart had active prescriptions for Amitriptyline, Gabapentin, and Baclofen. (Id.). He did not complain of jaw or testicular pain. (Id.).

On February 18, 2018, Stewart submitted a sick call slip requesting a renewal of his medications and stating that he had a sore shoulder, a cut on his groin, and severe pain in his groin.. (Id. at 188). Stewart was seen at sick call on February 21, 2018, where he complained of chest pain and pain radiating in his arm. (Id. at 27). During examination, Stewart reported that his food had been poisoned with crushed glass, causing a needle-like pain in his chest and abdomen as well as generalized chest pain. (Id.). Stewart's vital signs were normal. (Id.). The nurse noted that Stewart had placed several sick calls recently, and

he was advised that his sick calls would be processed and his concerns addressed. (Id.). Stewart did not complain of jaw or testicle pain during this encounter. (See id.).

Stewart submitted a sick call slip on February 27, 2018, asking to see a provider for renewal of his medication orders and again reporting that his food had been poisoned, resulting in chest, stomach, and groin pain, dizziness, and nausea. (Id. at 187). On March 1, 2018, Stewart was seen by Pierce. (Id. at 12). At that time, Stewart requested prescriptions for Ultram (Tramadol), muscle relaxant Baclofen, and Neurontin, informing Pierce that he took Neurontin for his seizure disorder and had a history of seizures. (Id.). Stewart also reported that he was prescribed Dilantin for seizure control, but Stewart's electronic health records did not indicate such. (Id.). Pierce noted that Stewart was not sure when his last seizure occurred. (Id.). Additionally, Pierce commented that the Neurontin appeared to have been prescribed in July of 2010 to treat Stewart's neuropathic pain and was continued at various doses until July of 2017, when the diagnosis was changed to epilepsy. (Id.). Pierce discussed alternative pain medications with Stewart, including the use of Cymbalta or Depakote, but Stewart was not receptive. (Id.). Stewart also requested that his prescription for Amitriptyline be discontinued because he reported that it did not work. (Id.). Pierce submitted a consultation request for a CT scan of Stewart's chest, abdomen, and pelvis. Pierce also requested a clinical pharmacist review of Stewart's chronic pain syndrome so that she could understand why he had been prescribed Neurontin. (Id. at 16; June 18, 2019 Pierce Decl. ["1st Pierce Decl."] ¶ 10, ECF No. 16-4).

On March 18, 2018, Stewart underwent a CT scan of the chest, abdomen, and pelvis, which showed no abnormalities. (Medical Records at 10–11).

Stewart submitted a sick call slip on March 22, 2018, asking to have his chronic care medications renewed, checking whether his CT scan had been scheduled, and asking for muscle rub, throat lozenges, and ointment. (Id. at 185). Notations on the sick call slip indicate that the CT scan was approved and questioned whether the medications were available in the commissary. (Id.). On March 26, 2018, Stewart did not appear for a scheduled appointment with Dr. Ashraf. (Id. at 18, 245).

On April 18, 2018, Pierce filed a non-formulary request for Stewart's Gabapentin to be renewed, which was approved for thirty days by Dr. Getachew. (Id. at 28).

Stewart filed sick call slips on April 29 and 30, 2018, complaining of a sore throat, asking for renewal of his Tramadol, Baclofen, and Flomax prescriptions, and inquiring if his follow-up consultation with the oncologist had been scheduled. (Id. at 178–79). Pierce rarely reviews sick call requests as they are triaged by nursing staff, however, her signature appears on the April 29 and 30 sick calls, indicating she did see them. (Id.; 2d Pierce Decl. ¶ 10). On April 30, 2018, Stewart refused to be examined by Pierce, noting that she was "a waste of his time." (Medical Records at 33). Pierce avers that providers do not renew any medication without actually seeing the patient and Stewart's medications were not renewed because he refused his visit. (2d Pierce Decl. ¶ 10).

Stewart filed another sick call slip on May 9, 2018, asking to see a provider to have his medications renewed, complaining of shoulder pain, and asking to have his oncology follow-up appointment scheduled. (Medical Records at 182).

On May 17, 2018, Pierce submitted another request for Gabapentin, which was approved by Dr. Getachew for ninety days. (Id. at 34). On May 21, 2018, Stewart was seen

by Pierce for a scheduled visit. (Id. at 49). Pierce noted that Stewart's CT scans showed no abnormalities and a follow-up consultation with the oncologist was requested. (Id. at 49, 53). Stewart requested Ultram, Baclofen, and Neurontin, and reported back pain with shooting pain down both legs. (Id. at 49). Pierce described Stewart as raising his voice, saying, "I am taking Neurontin for back pain! It is not taking care of the pain! Either do your job and get me Baclofen and Ultram or get a MD that will!" (Id.). Although Pierce explained that Stewart's medical records indicated he was receiving Neurontin for his seizure disorder, Stewart responded that he was receiving it for back pain and demanded Ultram. (Id.). Stewart also requested Baclofen for muscle spasms in his left foot. (Id.). Pierce tapered Stewart's prescription for Neurontin based on his report that it was ineffective and increased the Amitriptyline to treat Stewart's neuropathic pain.[4] (Id.). Pierce also prescribed ibuprofen as needed to treat Stewart's chronic pain and Keppra for seizure control. (Id.; see also 1st Pierce Decl. ¶ 12). Pierce noted that Ultram and Baclofen were not indicated, and that Stewart was displeased with the treatment plan. (Medical Records at 50).

Pierce explains that Neurontin/Gabapentin is one of several anticonvulsant medications used to treat pain caused by damaged nerves. (1st Pierce Decl. ¶ 13). The Food and Drug Administration has approved Gabapentin for management of nerve pain arising from shingles and for treatment of seizures. (Id.). Pierce explains that through its clinical use medical providers determined that Gabapentin also appeared to have positive effects

---

[4] Stewart denies telling Pierce that Neurontin was ineffective. (Pl.'s Opp'n Defs.' Mot. ["Pl.'s Opp'n"] at 18, ECF No. 22-1).

on other types of nerve pain and providers prescribed Gabapentin to treat such pain. (Id.). However, over the last several years controversy developed over the efficacy of Gabapentin for all types of nerve pains. (Id.). Moreover, Gabapentin is prone to abuse in the correctional setting because it induces euphoria when taken in substantial quantities. (Id.). In light of its inconsistent effectiveness for treating nerve pain and its potential for abuse, other available alternative pain medications, such as Amitriptyline and Cymbalta, can be used. (Id.).

Stewart submitted a sick call slip on May 27, 2018 to renew his Flomax and Baclofen prescriptions. (Medical Records at 180). A note was entered indicating that Stewart was evaluated by Pierce on May 21, 2018 and his medication orders were current, although the prescriptions for Baclofen and Flomax had both expired. (Id.).

Stewart filed another sick call slip on May 29, 2018 again seeking renewal of his prescriptions for Baclofen, Flomax, and allergy medications, and complaining of pain in his chest and throat. (Id. at 181). Stewart was seen the following day by Nurse Mast. (Id. at 55). At that time, Stewart reported no active complaints of pain, but stated he needed Baclofen for back pain and Flomax for urinary issues. (Id.). The nurse referred Stewart to a provider. (Id. at 56). Stewart did not complain of jaw or testicular pain during the visit. (Id. at 55–56).

A "sick call tracking triage discipline" note, dated May 31, 2018, indicates that Stewart sent a letter in an envelope, which he was previously advised not to do, and that Stewart was reminded he was only to send documents on approved sick call forms. (Id. at 57). Specifically, the note stated: "Only approved DOC sick calls to be submitted, open

9

and, and not in envelopes so custody can review for inappropriateness. This is an on-going issue. He has been informed of this on several occasions." (Id.).

On June 6, 2018, Stewart was evaluated by Dr. Qamar Zaman at the Schwab Family Cancer Center. (Id. at 38). Stewart's medical history was recounted, including that the CT scan of his neck, chest, abdomen, and pelvis showed mild spondylytic changes of the cervical spine but no evidence of malignancy. (Id.). Additionally, the CT scan of his chest, abdomen, and pelvis from April 23, 2018 showed no abnormalities. (Id.). At the time of his appointment, Stewart complained of radicular pain in the right lower extremity and mild puffiness in the lower extremities, as well as low back pain radiating down his right leg. (Id. at 38–39). Although there was no evidence of recurrence of the cancer, he was directed to return in six months and to follow up with medical staff at the institution regarding his complaints of chronic pain. (Id. at 40).

Stewart filed a sick call slip on June 10, 2018, requesting an ear cleaning and asking to see a provider so that his orders for Flomax, Neurontin, and Baclofen could be "fixed." (Id. at 177). A note was entered on the sick call slip that Neurontin was issued in a tampering dose and was to be discontinued; Baclofen had been discontinued on February 16, 2018; and Flomax discontinued on January 8, 2018. (Id.). Stewart refused to be seen at sick call on June 12, 2018. (Id. at 58).

On June 15, 2018, Stewart filed a sick call slip seeking to renew his prescriptions for eye drops, Prilosec, and ibuprofen and asking to have his ears cleaned. (Id. at 176). He was seen by Nurse Mast on June 20, 2018 who referred Stewart to a provider for evaluation. (Id. at 59–60).

Stewart filed another sick call slip on July 3, 2018, asking to see a provider for renewal of unspecified medications and complaining of right shoulder pain and athlete's foot. (Id. at 175). Stewart was seen by Nurse Shively on July 6, 2018. (Id. at 62). At that time, Stewart had active prescriptions for ibuprofen and Amitriptyline. (Id.). Shively noted that Stewart was given muscle rub and explained she would check to see whether over the counter lotion could be ordered for dry skin. (Id. at 175). Stewart did not complain of jaw pain or testicular pain during this encounter. (See id. at 62, 175).

On July 9 and 23, 2018, Stewart spoke with nurses during segregation rounds concerning his next psychiatry appointment. (Id. at 379–81, 385–87). He did not complain of jaw pain or testicle pain during either encounter. (See id.).

On July 23, 2018, Stewart filed a sick call slip, asking to see a provider due to a bump on his head, a sore shoulder, and severe muscle spasms. (Id. at 174). Stewart was evaluated on July 25, 2018 by Nurse Shively. (Id. at 63). Shively did not observe any cuts, redness, or swelling on Stewart's head. (Id. at 65). Stewart's prescriptions for ibuprofen and Amitriptyline remained active. (Id.). Stewart did not complain of jaw or testicular pain during the visit. (See id. at 64).

Stewart was seen on July 29, 2018 by Nurse Martin for a routine exam, (id. at 390), and again the following day by Nurse Stair for the same complaints indicated in the July 23, 2018 sick call, (id. at 67). Again, Stewart did not report jaw or testicular pain during these visits. (Id.).

On August 3, 2018, Pierce saw Stewart for a full physical. (Id. at 69). Stewart reported chronic back pain but was in no apparent distress. (Id. at 70). Stewart declined a

digital rectal exam. (Id.). Other than impacted wax in his ears, Stewart's examination was unremarkable, and his medications were continued. (Id. at 70–71). Stewart did not mention any jaw or testicular pain during the exam. (Id.; see also 1st Pierce Decl. ¶ 19).

On August 10, 2018, Stewart was seen by Nurse Klepitch during segregation rounds. (Medical Records at 72). Stewart asked about pain cream that he thought was ordered. (Id. at 72). Klepitch advised him that none was ordered and directed him to place a sick call slip. (Id.). Stewart did not voice any other complaints at that time. (Id.).

The following day, Stewart was seen by Nurse Shively on segregation rounds, at which time Stewart again asked about muscle rub and cream. (Id. at 73). Shively noted that "inmate was referred to provider 7/25/18. Imm. Was told to get all OTC creams and rubs through commissary." (Id.). Stewart did not complain of jaw or testicular pain. (Id.).

On August 17, 2018, Stewart was seen by Nurse Chucci during segregation rounds. (Id. at 74). Stewart reported that his Neurontin and Keppra had been discontinued, he was to have blood work done, and he wanted his ears flushed. (Id.) Stewart did not state any other complaints. (Id.). Chucci noted that Stewart's medical records reflected that the Neurontin prescription was discontinued on June 21, 2018 because Stewart claimed it was ineffective. (Id.). Chucci noted that Stewart would be referred to a provider for medication review/management. (Id.).

On August 19, 2018, Stewart submitted a sick call slip through Klepitch while he was on segregation rounds. (Id. at 75). The following day, certified registered nurse practitioner Katrina Opel examined Stewart at Chronic Care/Sick Call. (Id. at 76). Stewart reported that he had back pain, nerve pain, and muscle spasms. (Id.). Stewart requested to

have Neurontin reordered and advised that no other medication worked. (Id.). At the time, Stewart was taking Amitriptyline, but complained that it made him light-headed. (Id.). Opel advised Stewart to try taking the medication before he went to bed, but Stewart reported that he woke up frequently at night to use the bathroom and did not want to be dizzy. (Id.). Opel offered Stewart Cymbalta, but Stewart refused it because he was on Zoloft. (Id.). When asked if the Zoloft helped his depression, Stewart reported that it did not. (Id.). Stewart was advised that he could be taken off Zoloft and started on Cymbalta, but Stewart reported that he did not want Cymbalta because he thought he was allergic to it. (Id.). Opel described Stewart as "assertive and argumentative about needing Neurontin." (Id.). Stewart was told he would need to try other medications first but refused, insisting that Neurontin was the only medication that worked. (Id.). According to Opel, Stewart became agitated and said, "I am going to sue medical for not giving me the medication that I need." (Id.).

As to his seizure disorder, Stewart reported that he was compliant with taking Keppra and had not had any recent seizure activity. (Id.). Opel renewed Stewart's bottom bunk status, provided additional education about his disorder, and stressed the importance of his medications. (Id.). Opel also reviewed Stewart's asthma and blood pressure medications, to which Stewart reported that he was compliant with his medications. (Id.). Stewart's conditions were described as stable. (Id.). Additionally, Opel noted that, in regard to Stewart's chronic pain syndrome, he was negative for loss of bowel or bladder and that Stewart reported neck and back pain. (Id.). During his examination, Stewart did not complain of prostate issues or jaw pain. (Id.). Opel directed that Stewart be scheduled for the chronic care clinic/pain management in ninety days. (Id. at 78).

Stewart filed a sick call slip on August 24, 2018, asking to renew his prescriptions for Flomax and Zyrtec, seeking to have his ears cleaned, and requesting lab work to test his prostate. (Id. at 171). The same day, Klepitch saw Stewart during segregation rounds, and Stewart advised that he had an order to have his ears flushed. (Id. at 79). Stewart did not complain of jaw or testicular pain. (Id.). Klepitch noted that Stewart was seen by the provider on August 20, 2018 and all issues were addressed, including pain management, and no orders were entered for an ear flush. (Id.).

Stewart filed a sick call slip on August 28, 2018, seeking renewal of his Flomax prescription and complaining of clogged ears and severe muscle spasms. (Id. at 170). Stewart was seen the following day at nurse sick call, once again seeking to have his Flomax refilled and complaining of ear discomfort. (Id. at 80). Stewart reported occasional difficulty with urination and noted that he had taken Flomax in the past, but the prescription expired on January 18, 2018. (Id.). Examination showed dull tympanic membranes with a small amount of cerumen in the left canal but no active drainage. (Id.). Stewart did not complain of jaw or testicular pain and was referred to the provider for possible prostate issues. (Id. at 81). Stewart's prescription for Flomax was renewed on August 29, 2018, through December 29, 2018. (Id. at 93).

On September 8, 2018, a note was entered indicating that Stewart asked about possible ear flush during segregation rounds; however, Stewart's medical chart was reviewed and an ear flush was not indicated after his evaluation. (Id. at 82). There is no record that Stewart complained of jaw or testicle pain during this encounter. (Id.).

Stewart again requested an ear flush on September 12, 2018, but the nurse on segregation rounds noted that he was already seen in sick call about the issue and flushing was not warranted. (Id. at 83). In response to Stewart's request for blood work, he was instructed to place a sick call. (Id.).

Stewart filed a sick call slip on October 1, 2018, complaining of pain on the left side of his jaw. (Id. at 168). The slip was referred to the dental department and he was evaluated by dentist Alan Graves on October 4, 2018. (Id. at 204). On October 10, 2018, Dr. Graves submitted a consultation request for Stewart to be seen by an oral surgeon at University of Maryland Medical Center for evaluation and treatment of chronic myofascial pain, noting that Stewart's dental x-ray showed a slight reduction of bone in Stewart's left mandibular fossa. (Id. at 90).

On October 17, 2018, Stewart filed a sick call slip stating that he needed to have his ears cleaned due to wax build-up and complaining of athlete's feet and chronic pain syndrome. (Id. at 167). In response to this sick call slip, Nurse Klepitch evaluated Stewart for nurse sick call. (Id. at 93). During the examination, Stewart reported that he was in chronic pain and wanted Baclofen. (Id.). Stewart's ear canals appeared clear. (Id.). Stewart was referred to a provider and was advised to submit a sick call if his symptoms did not subside. (Id. at 94). Stewart did not offer any complaints of jaw or testicle pain during the visit. (Id. at 93–94).

On October 23, 2018, Stewart submitted a sick call slip complaining of athlete's feet, pain due to chronic pain syndrome, and nerve damage, as well as eye pain, blurred vision, excessive tearing, and stinging due to glaucoma. (Id. at 166). Stewart saw Nurse

Klepitch that day and complained of eye pain from glaucoma and nerve pain. (Id.). Klepitch reported that Stewart appeared to have athlete's foot. (Id.). Klepitch noted that Stewart was referred to a provider on October 18, 2018; Klepitch again referred Stewart to the provider. (Id. at 95–96).

Stewart submitted a sick call slip on October 30, 2018, asking to see a provider for chronic pain syndrome regarding a dislocated jaw and severe pain in his eyes and head. (Id. at 165). The sick call slip was referred to the optical department, which noted that Stewart's last examination was January 31, 2018 and that he received glasses on March 8, 2018. (Id.).

On November 8, 2018, Stewart was examined by Dr. Gary Warburton, a dental, oral and maxillofacial surgeon, for left side jaw and muscle pain. (Id. at 84). Stewart explained that the left jaw pain started in 2014 when he was assaulted and had gotten progressively worse. (Id.). Stewart reported that he had been placed on a soft diet, muscle relaxers, and tramadol, which improved his symptoms, but the medications had been discontinued. (Id.). Dr. Warburton examined Stewart and noted, "Bilateral TMJ clicking on opening. Left TMJ popping on opening. On auscultation bilateral TMJ clicking." (Id. at 85). Dr. Warburton recommended that Stewart be placed on a soft dental diet; be provided ibuprofen if his kidney function allowed; have a CT scan of sinus/facial mandible; have an MRI; and return for follow-up after the diagnostic tests were performed. (Id.). Stewart filed a sick call slip on November 10, 2018, asking to see Dr. Graves to have the orders completed for the testing requested by the oral surgeon. (Id. at 164).

On November 26, 2018, Nurse Beeman entered a chart update noting that after discussion with Pierce, Stewart's prescriptions for Prilosec, hydrochlorthiazide, and Keppra were renewed or started. (Id. at 97).

On December 28, 2018, Pierce submitted consultation requests for Stewart to have CT scans of his abdomen, pelvis, neck, and chest. (Id. at 99, 101). Pierce also submitted a consultation request for Stewart to be seen for follow-up in oncology. (Id. at 105).

On January 1, 2019, Corizon Health replaced Wexford Health as the contracted health care provider at NCBI. (1st Pierce Decl. ¶ 32).

On January 3, 2019, Stewart was transferred from NBCI to the infirmary at Western Correctional Institution ("WCI") to be kept overnight in anticipation of his CT scans, which required that he not eat or drink anything beforehand. (Medical Records at 114). Stewart was taken to the radiology department at Western Maryland Regional Medical Center and returned to NBCI that day. (Id. at 115). On January 7, 2019, Stewart was seen by Dr. Qamar Zaman for follow-up about the malignant neoplasm. (Id. at 122).

On January 11, 2019, Stewart submitted a sick call slip asking to see a provider for chronic care, indicating that he had not been seen for six months. (Id. at 162). Stewart stated that he needed a provider to reorder Flomax and to submit a consultation request for the MRI and CT scan that were ordered by the oral surgeon. (Id.). The following day, however, Stewart refused to be seen by medical staff. (Id.).

On February 4, 2019, Stewart was seen by Pierce in the chronic care clinic. (Id. at 126). Pierce noted that Stewart had been seen by the oncologist, who requested blood work prior to Stewart's next visit in July. (Id.). Stewart's hypertension, epilepsy, and asthma

were all under control. (Id.). Pierce also noted that Stewart saw an outside oral maxillofacial surgeon, who recommended CT scans of Stewart's sinus and facial mandible and MRI of Stewart's TMJ, with instructions to return for follow-up when the diagnostic testing was completed. (Id.). Pierce palpated Stewart's jaw; while Stewart reported that it was painful, Pierce did not hear any clicking, popping, grinding, or crepitus. (1st Pierce Decl. ¶ 36). Although there are no notes concerning prostate or urinary issues, Stewart had an active prescription for Flomax from January 12, 2019 to May 12, 2019. (Medical Records at 128). No pain medications were listed. (Id.). The same day, Pierce submitted a consultation request for the diagnostic testing requested by the oral surgeon. (Id. at 130).

On February 26, 2019, a nursing note indicates that Stewart had valid prescriptions for Flomax from February 6, 2019 to June 6, 2019; once again, no active pain medications were listed. (Id. at 139).

Stewart underwent a CT scan of the maxillofacial area on March 18, 2019, which showed sinus inflammation but was otherwise unremarkable. (Id. at 270).

On March 20, 2019, Stewart filed a sick call slip asking to see a provider for severe pain in his groin and renewal of his eye drops. (Id. at 160). On March 29, 2019, Stewart filed a sick call slip complaining of migraine headaches and inquiring about the scheduling of his MRI. (Id. at 158).

On April 8, 2019, Klepitch consulted with Stewart regarding the MRI for his TMJ. (Id. at 309). Stewart was advised that the consultation was placed on February 4, 2019 and all pre-MRI paperwork had been completed. (Id.). Stewart did not complaint of jaw or testicular pain at this time. (Id.).

Pierce evaluated Stewart in the chronic care clinic on April 16, 2019. (Id. at 144, 292). Pierce described Stewart's cancer, hypertension, epilepsy, and asthma as stable. (Id. at 144). Pierce noted that Stewart's MRI for the TMJ was pending. (Id. at 145, 293). Stewart did not complain of testicle pain during this visit. (Id.). Stewart's prescription for Flomax remained valid, and no orders were in place for analgesic pain medication. (Id.).

On April 19, 2019, Stewart filed a sick call slip complaining of severe and debilitating pain in his left jaw and left ear with severe migraine headaches, which he attributed to having a dislocated jaw. (Id. at 272). Stewart stated that the off-site specialist directed Stewart to receive an MRI and return for follow-up, but that did not happen. (Id.). The same day, Stewart refused to report to sick call; accordingly, Pierce spoke to Stewart through his cell door to advise him that the MRI had been scheduled. (Id. at 148, 291). At that time, Stewart had an active prescription for Flomax from April 19, 2019 to August 19, 2019. (Id.). Stewart did not raise any complaints of pain during this encounter and appeared to Pierce not to be in distress. (Id.; see also 1st Pierce Decl. ¶ 41). No medications were ordered for pain management. (Medical Records at 148, 291).

Stewart was originally scheduled to have an MRI on March 5, 2019. (1st Pierce Decl. ¶ 44). Due to Stewart's poor adjustment history, he must be transported by a special transport team. (Id.). On March 5, 2019, Stewart was notified to get ready for the appointment; however, when the special transport team arrived, Stewart was not ready, causing Stewart's MRI appointment to be cancelled because he would have been

significantly late.[5] (Id.). The appointment was rescheduled for May 10, 2019, but on that date one of the special transport team members was ill and was unable to transport Stewart. (Id.). The MRI rescheduled for May 14, 2019 was cancelled yet again, this time because none of the officers on the team had flexible handcuffs and Stewart could not undergo the MRI in regular metal handcuffs. (Id.).

Stewart underwent the MRI on June 24, 2019, which showed anterior subluxation of the meniscus of the left TMJ with anterior and superior subluxation of the mandibular condyle anterior of the articular tubercle.[6] (Supp. Medical Records at 1). There was poor visualization of the right TMJ with probable deformity of the right mandibular ramus and condyle. (Id.). The radiologist recommended further evaluation with a CT scan if clinically indicated; however, the results of Stewart's March 18, 2019 CT scan were essentially normal. (Id.).

On July 24, 2019, Pierce reviewed the results from the March 18, 2019 CT scan and June 24, 2019 MRI with the on-site dentist and submitted a request for a follow-up consultation with the oral surgeon. (Medical Records at 68). On August 3, 2019, Stewart filed a sick call slip asking to see the dentist and complaining that he was in excruciating pain due to his jaw being dislocated.[7] (Id. at 42). Stewart submitted another sick call slip

---

[5] Stewart denies delaying his transportation; rather, Stewart contends that the officers arrived late, which caused him to be late for the MRI. (Opp'n at 16).

[6] "Subluxation is a self-reducing, incomplete dislocation of the TMJ in which the patient is able to close his or her mouth without assistance." (2d Pierce Decl. ¶ 27).

[7] Stewart's jaw is subluxed, but not dislocated, meaning that his jaw does not line up exactly top to bottom and occasionally clicks and pops. (2d Pierce Decl. ¶ 27). According to Pierce, this condition is common and can generally be managed with nonsteroidal anti-inflammatory drugs. (Id.). However, on July 24, 2019, Stewart refused

asking to see the dentist on August 6, 2019, but refused his dental examination that day. (Id. at 35, 41, 49). On August 9, 2019, Stewart was seen by dentist Ademola Cole, who submitted another consultation request for Stewart to have a follow-up with the oral surgeon. (Id. at 51). Dr. Cole noted clicking and popping on Stewart's left and right TMJ and that the panoramic x-ray showed flattening of the left and right condyles. (Id.).

## C.   Procedural History

On March 4, 2019, Stewart filed a Complaint against Corizon and Pierce. (ECF No. 1). Stewart filed a Supplemental Complaint on May 29, 2019. (ECF No. 13).[8] Stewart contends that Defendants were deliberately indifferent to his pain and serious medical conditions in violation of the Eighth Amendment to the United States Constitution. (Compl. at 6, 8). Stewart seeks compensatory damages as well as an order directing Corizon to send him to a urologist. (Id. at 3).

---

ibuprofen 600 mg, stating it did not work for him. (Medical Records at 68). Stewart contends that ibuprofen causes him to bleed internally. (Opp'n at 20). However, there is no evidence in the record that this is true.

[8] The Supplements docketed at ECF Nos. 14 and 21 are identical copies of ECF No. 13.

On June 24, 2019, Defendants filed their Motion to Dismiss or Alternatively for Summary Judgment. (ECF No. 16). Stewart filed his Opposition on July 19, 2019. (ECF No. 22).[9] Defendants filed a Reply on August 16, 2019. (ECF No. 30).[10]

## II.    DISCUSSION

### A.    <u>Conversion of Defendants' Motion</u>

Defendants' Motion is styled as a motion to dismiss under Rule 12(b)(6) or, in the alternative, for summary judgment under Rule 56. Motions styled in this manner implicate the Court's discretion under Rule 12(d). <u>See</u> <u>Kensington Vol. Fire Dep't., Inc. v.</u>

---

[9] Stewart also filed various documents with the Court on July 19, 2019, July 29, 2019, and September 24, 2019, which the Court reads together with his Opposition. (<u>See</u> ECF Nos. 20, 26, 41).

In his Opposition, Stewart claims for the first time that he filed numerous sick call slips complaining of severe muscle spasm and nerve damage in the legs and feet; his prescription for Baclofen had expired; Corizon is liable for breaching its contract with the State of Maryland to provide adequate medical care to inmates; Corizon has a custom of allowing its schedulers to delay scheduling him for ninety days beyond the three months required for chronic care visits; and he has not been sent back to the oral surgeon. (Opp'n at 1–2, 10, 13; <u>see also</u> ECF Nos. 41 & 45).

Briefs in opposition to a dispositive motion may not be used to amend a complaint or add new claims. <u>See</u> <u>Zachair Ltd. v. Driggs</u>, 965 F.Supp. 741, 748 n.4 (D.Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), <u>aff'd</u>, 141 F.3d 1162 (4th Cir. 1998); <u>Mylan Laboratories, Inc. v. Akzo, N.V.</u>, 770 F.Supp. 1053, 1068 (D.Md. 1991), <u>aff'd</u>, 2 F.3d 56 (4th Cir. 1993). As such, the Court will not consider these additional allegations.

[10] Although the Court treats Corizon's Motion as one filed jointly by Corizon and Pierce, the Court takes note of Pierce's Reply, which she filed individually on October 1, 2019. (ECF No. 42).

In her Reply, Pierce maintains that Stewart filed two sick call slips threatening to rape and kill Pierce and to kill Pierce's daughter and granddaughter. Pierce seeks an order from the Court enjoining Stewart from engaging in any such further behavior. Stewart denies filing these sick call slips and reports that another inmate is writing to Pierce in his name. (<u>See</u> ECF No. 44). Although Pierce's allegations are troubling, the Court declines to engage in the discipline of state inmates and will take no action as to Pierce's request.

Montgomery Cty., 788 F.Supp.2d 431, 436–37 (D.Md. 2011), aff'd, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" Wells-Bey v. Kopp, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005). The Court "does not have an obligation to notify parties of the obvious." Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 261 (4th Cir. 1998).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party

had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To raise the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration, explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56.

Here, the Court concludes that both requirements for conversion are satisfied. Stewart was on notice that the Court might resolve Defendants' Motion under Rule 56 because Defendants styled their Motion in the alternative for summary judgment and presented extra-pleading material for the Court's consideration. See Moret, 381 F.Supp.2d at 464. In addition, the Clerk informed Stewart about the Motion and the need to file an opposition. (See ECF Nos. 17 & 38). Stewart filed an Oppositions, as well as numerous other documents in support of his claims, but did not include a request for more time to conduct further discovery. Because the Court will consider documents outside of Stewart's Complaint in resolving Defendants' Motion, the Court will treat the Motion as one for summary judgment.

**B.  Standard of Review**

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of

materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Following a properly supported motion for summary judgment, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The non-movant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the

nonmoving party's favor. <u>Anderson</u>, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986).

**C.    <u>Analysis</u>**

**1.    Supervisory Liability**

Stewart's theory of liability as to Defendant Corizon is premised exclusively on the doctrine of respondeat superior. However, liability through a mere agency relationship is not available for § 1983 claims. <u>See</u> <u>Love-Lane v. Martin</u>, 355 F.3d 766, 782 (4th Cir. 2004) (holding that there is no respondeat superior liability under § 1983). Assuming that Corizon is a state actor for § 1983 purposes, it cannot be held liable solely on the theory respondeat superior. <u>See</u> <u>Austin v. Paramount Parks, Inc.</u>, 195 F.3d 715, 727–28 (4th Cir. 1999); <u>Powell v. Shopco Laurel Co.</u>, 678 F.2d 504, 506 (4th Cir. 1982); <u>Clark v. Md. Dep't of Pub. Safety & Corr. Servs.</u>, 316 F.App'x 279, 282 (4th Cir. 2009). Rather, the record evidence must demonstrate that Corizon, through its supervisory staff and structure, deprived Stewart of his Eighth Amendment rights by virtue of implementing an unconstitutional policy, practice or custom. <u>See</u> <u>Monell v. N.Y. City Dep't of Soc. Servs.</u>, 436 U.S. 658, 690 (1978). There is no evidence in the record that meets this requirement. Thus, the Court will enter judgment in favor of Corizon.

**2.    Eighth Amendment Claims**

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. Gregg v. Georgia, 428 U.S. 153, 173 (1976); see also Hope v. Pelzer, 536 U.S. 730, 737 (2002); Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016); King v. Rubenstein, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." De'Lonta v. Angelone, 330 F.3d 630, 633 (4th Cir. 2003) (citing Wilson v. Seiter, 501 U.S. 294, 297 (1991)); accord Anderson v. Kingsley, 877 F.3d 539, 543 (4th Cir. 2017). To prevail on an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. See Estelle v. Gamble, 429 U.S. 97, 106 (1976); see also Anderson, 877 F.3d at 543. A prisoner plaintiff must allege and provide some evidence he was suffering from a serious medical need and that defendants were aware of his need for medical attention but failed to either provide it or ensure it was available. See Farmer v. Brennan, 511 U.S. 825, 834–37 (1994); see also Heyer v. U.S. Bureau of Prisons, 849 F.3d 202, 209–10 (4th Cir. 2017); King v. Rubenstein, 825 F.3d 206, 218 (4th Cir. 2016); Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008).

Objectively, the medical condition at issue must be serious. See Hudson v. McMillian, 503 U.S. 1, 9 (1992) (finding there is no expectation that prisoners will be provided with unqualified access to health care); Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014). A serious medical condition is an illness or condition that is either life-threatening or causes an unnecessary infliction of pain when it is not treated properly. See,

e.g., Barnes v. Bilak, No. JKB-17-1057, 2018 WL 2289232, at *6 (D.Md. May 17, 2018) (finding that high blood pressure is a serious medical need); Johnson v. Quinones, 145 F.3d 164, 168 (4th Cir. 1998) (finding that pituitary tumor is a serious medical need); Brown v. Harris, 240 F.3d 383, 389 (4th Cir. 2001) (finding that risk of suicide is a serious medical need).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition. See Farmer, 511 U.S. at 839–40; see also Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference because 'prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995) (quoting Farmer, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through other evidence that tends to establish the defendants knew about the problem. This includes evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." Scinto, 841 F.3d at 226 (quoting Farmer, 511 U.S. at 842).

Mere negligence or malpractice does not rise to the level of constitutional violation. Donlan v. Smith, 662 F.Supp. 352, 361 (D.Md. 1986) (citing Estelle, 429 at 106); see also Scinto, 841 F.3d at 225 ("Deliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that

harm will result."); Russell v. Sheffer, 528 F.2d 318, 318 (4th Cir. 1975) ("[M]istreatment or non-treatment must be capable of characterization as 'cruel and unusual punishment' in order to present a colorable claim[.]")

Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. See Lightsey, 775 F.3d at 179 (finding physician's act of prescribing treatment raises a fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). Additionally, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." United States v. Clawson, 650 F.3d 530, 538 (4th Cir. 2011) (quoting Bowring v. Godwin, 551 F.2d 44, 47–48 (4th Cir. 1977)).

Here, the record lacks any evidence showing that Pierce was aware of Stewart's prostate condition, let alone that Stewart's purported condition was serious. As a preliminary matter, the extent of Stewart's prostate issues is unknown, as Stewart refused a digital rectal exam on August 3, 2018, there was no medical indication for his Flomax prescription, and his medical records do not show he had ever been formally diagnosed with a prostate condition. (2d Pierce Decl. ¶ 11).

Additionally, even if Flomax was medically necessary, Pierce was not responsible for the discontinuation of Stewart's Flomax prescription. Rather, another nurse practitioner

declined to renew the medication because there was no associated diagnosis explaining its use. Stewart was scheduled to see Pierce on January 25, 2018 but did not appear for his visit. According to Pierce, Stewart could have requested Flomax had he attended this visit. (2d Pierce Decl. ¶ 9). Stewart ultimately did not request renewal of his prescription until April 29 and 30, 2018, when he submitted sick call slips seeking to renew several medications. Pierce reviewed these slips and scheduled Stewart to see her on April 30, 2018, but once again did not come to his appointment.

Thereafter, although Stewart filed two sick call slips referencing testicular or groin pain, he never raised these complaints, described his prostate condition, or requested Flomax during any of his visits with Pierce. (2d Pierce Decl. ¶ 10). No other nurse or provider informed Pierce that Stewart needed his prescription for Flomax renewed. (Id. ¶ 11). In all, any prostate or groin issues suffered by Stewart were not "diagnosed by a physician as mandating treatment or . . . so obvious that even a lay person would easily recognize the necessity for a doctor's attention." See Lightsey, 775 F. 3d at 178 (quoting Iko, 535 F.3d at 241). Because Pierce was not aware of Stewart's prostate issues, it cannot be said that she was deliberately indifferent to his serious medical condition.

Nor is there evidence that Pierce was deliberately indifferent to Stewart's jaw pain. Pierce attests she was not aware of Dr. Warburton's recommendation for Stewart to receive a CT scan and MRI of his jaw until she saw Stewart for chronic care on February 4, 2019 because the recommendation had been sent to the dental department, not the medical

department.[11] (1st Pierce Decl. ¶ 29). Upon learning about Dr. Warburton's recommendation during Stewart's chronic care visit, Pierce promptly submitted the consultation request that same day. (Id.; see also Medical Records at 130). Although Stewart insists that Pierce was aware of Dr. Warburton's recommendation because the response to his ARP indicated that a "provider has been notified" to schedule an appointment, nothing in Stewart's ARP or the other documents in the record suggest that Pierce was the "provider" mentioned in the ARP. (Opp'n Exs. at 34, ECF No. 22-2). Indeed, Warden Bishop confirms that he never spoke with Pierce about scheduling Stewart for outside diagnostic tests. (Bishop Decl. ¶ 6, ECF No. 30-1).

As to Stewart's claims about the five-month delay between his chronic care appointments, evidence in the record shows that the delay cannot be attributed to Pierce. According to Pierce, she has no role in scheduling patients' medical appointments or chronic care visits, nor does she know why Stewart's chronic care was delayed. (1st Pierce Decl. ¶ 35). Although Stewart contends Pierce was aware of the delay because he filed an ARP about the issue, the ARP response merely indicates that unidentified "medical staff" were reminded to schedule chronic care patients in the appropriate time frame. (See Opp'n at 36). Because Pierce did not cause or have knowledge of the delay between Stewart's chronic care visits, Stewart's claim against her must fail.[12]

---

[11] According to Pierce, prior to December 2018, the dental department was responsible for submitting its own consultation requests; Pierce does not know why the dental department failed to submit the requests. (1st Pierce Decl. ¶ 29).

[12] Pierce also contends that, because Stewart is housed in a segregation unit, he is seen every day by a registered nurse during rounds who asks each inmate whether they need anything from medical. (1st Pierce Decl. ¶ 35). As such, even though Stewart was not

To the extent that Stewart contends Pierce was deliberately indifferent to his complaints of pain when she denied his requests for certain prescriptions, this claim is unavailing. During his March 1, 2018 and May 21, 2018 visits with Pierce, Stewart requested Baclofen for muscle spasms in his left foot, which Pierce determined were the result of neuropathic pain. (2d Pierce Decl. ¶ 14). Pierce concluded that Baclofen was not appropriate to treat Stewart's reported symptoms because it is a muscle relaxer that is not indicated for neuropathic pain or long-term use and has the potential for abuse. (Id.). Additionally, although Pierce denied Stewart's request for Neurontin, Stewart's medical records reveal that Pierce, along with other medical staff, offered Stewart a variety of alternative analgesic pain medications. Although Stewart clearly disagreed with the recommendations of his providers—often insisting that he had an adverse reaction to those drugs or that only certain drugs worked on him—Stewart's mere disagreement with the choice of medications does not amount to deliberate indifference. See Wright, 766 F.2d at 849.

Finally, although Stewart's various health issues appear to be chronic and long-standing, the evidence in the record demonstrates that Stewart himself contributed to the delay of treatment on many occasions by refusing to attend scheduled medical

---

seen in chronic care, Stewart nonetheless could have reported any medical concerns to the nurse conducting segregation rounds. (Id.).

For his part, Stewart disputes that nurses on segregation rounds would have addressed his complaints of pain, arguing that they barely stop at the cell door and will not take an inmate out of the cell for any reason other than chest pain, seizure, or an emergency. (Opp'n at 13). Even accepting Stewart's contention as true, there is no evidence that Stewart was harmed by missing a single chronic care visit in that five-month period. Rather, Stewart's condition remained stable during that time. (See 1st Pierce Decl. ¶ 35).

appointments or cooperate with his prescribed treatment plans.[13] To the extent that Stewart had to wait some time to receive diagnostic testing, evaluation, or medications, such delay was not unreasonable when considering Stewart's own refusal to participate in his care. See, e.g., Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990), overruled in part on other grounds by Farmer v. Brennan, 511 U.S. 825, 837 (1994), aff'd in pertinent part by Sharpe v. S.C. Dep't of Corr., 621 F.App'x 732 (4th Cir. 2015) (holding that treatment rendered must be so grossly incompetent or inadequate as to shock the conscience or to be intolerable to fundamental fairness).

In light of the evidence in the record, no reasonable factfinder could conclude that the medical care Pierce provided to Stewart was so inadequate so as to support an Eighth Amendment claim. Accordingly, the Court will enter judgment in favor of Pierce as to Stewart's Eighth Amendment claims.

### III.    CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment (ECF Nos. 16 and 37), which it construes as a motion for summary judgment. A separate Order follows.

Entered this 30th day of March, 2020.


_____/s/_____
George L. Russell, III
United States District Judge

---

[13] Stewart denies refusing to attend medical examinations, noting that he is at the mercy of custody staff to transport him. (Stewart Aff. at 8, ECF No. 22-3). While this may be true, under no circumstances were these delays attributable to Pierce or Stewart's other medical providers.